Filed 6/24/16  Santander v. City of Los Angeles CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JORGE SANTANDER, | B261390 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS145818) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, JoAnne O'Donnell, Judge.  Affirmed.

Silver, Hadden, Silver & Levine and Ken Yuwiler for Plaintiff and Appellant.

Michael N. Feuer, City Attorney and Paul L. Winnemore, Deputy City Attorney, for Defendants and Respondents.

_____

Appellant Jorge Santander, a former officer for Los Angeles Police Department (the Department), brought a petition for writ of administrative mandate against respondent City of Los Angeles contending he had been inappropriately terminated from his employment and seeking reinstatement. The termination occurred after a Board of Review hearing, at which appellant was found guilty of the following charges: on or about December 4, 2010, he used unauthorized force on Natasha Dennis when he used a Taser on her while she stood in the doorway of a patrol car (count one); on or about December 4, 2010, he used unauthorized force on Dennis when he tased her while she was seated in the back of the patrol car (count two); on or about December 4, 2010, he failed to accurately document the use of force in an arrest report (count four); on or about December 4, 2010, he failed to disclose evidence of a use of force incident -- a video taken by another officer at the scene -- to a Department supervisor (count six); and between January 18 and 19, 2012, he made false statements to a Department supervisor during an administrative investigation concerning his knowledge of the video recording (count eight).[1]

Appellant contends substantial evidence does not support the Board's findings or the trial court's independent determination of his guilt based on the record. He further contends the discipline imposed -- termination -- was the result of disparate treatment. We have reviewed the record and conclude that substantial evidence supports the findings of guilt. We further conclude that the discipline imposed was appropriate to the charges found true. Accordingly we affirm.

---

[1]    Appellant pled guilty to failing to give a warning to Dennis prior to using the Taser (count five). The Board found appellant not guilty of failing to report non-contact activations of a Taser (count three), and not guilty of violating Department policy by displaying to his fellow officers a Superman logo he had attached to his vest (count seven).

2

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background Facts*

Certain of the facts underlying the charges against appellant are not in dispute. In the early morning hours of Saturday, December 4, 2010, at approximately 1:30 a.m., Officer Steven Bauman and his partner, Officer Lepe, responded to a call to a location in Hollywood.[2] There, they encountered Natasha Dennis, who appeared to be very intoxicated. Bauman was wearing a personal video camera on his chest, which he switched on to videotape the encounter.[3] The two officers handcuffed Dennis and called for backup, seeking a female officer to search Dennis. Appellant and his partner, Officer Georgeta Buruiana, arrived. During the subsequent attempts to place Dennis in the back of a patrol car and induce her to sit upright, appellant tased her.[4] Appellant did not give Dennis a warning prior to tasing her.[5]

Two other officers, Chris Ignacio and Brian Jones, arrived at the scene shortly after Dennis was secured in the back of the patrol car, and conversed with the officers already there about what had happened and about Bauman's video

---

[2]     Officer Lepe's first name is not in the record.

[3]     Officer Bauman's use of a personal video recorder was against Department policy at the time.

[4]     There is no dispute that appellant tased Dennis once while she was outside the patrol car. Whether he tased her an additional time when he was in the back seat with her, and the circumstances surrounding the tasings, was disputed.

[5]     Under Department policy, "when feasible," an officer is required to "give a verbal warning," such as: "'stop what you are doing' . . . 'or we may use the [Taser] . . . that may cause you serious injury.'" The warning is not required when the officer "is attacked and must respond to the suspect's actions" or "if a tactical plan requires the element of surprise in order to stabilize the situation . . . ." The warning given by officers prior to use of force on a suspect is referred to as a "*Garner* warning." (Italics added.) (See *Tennessee v. Garner* (1985) 471 U.S. 1, 11-12; *Deorle v. Rutherford* (9th Cir. 2001) 272 F.3d 1272, 1283-1284.)

3

equipment and video recording. Due to the use of the Taser, a supervisor --
Sergeant Daniel Fournier -- was called to the scene to conduct a use of force
investigation. Neither appellant nor any of the other officers there advised
Fournier of the existence of the video. When the officers returned to the station,
Fournier instructed Lepe to draft the arrest report describing the encounter with
Dennis, and told appellant to draft the section of the report documenting the use of
force.

The station's holiday party took place that evening. At the party, Fournier
heard about Bauman's video recording. After Fournier obtained and viewed the
video, he turned the matter over to internal affairs.


B. *Internal Affairs Interview of Appellant*

In January 2011, Sergeant David Brown was assigned to investigate the use
of force incident. On January 18 and 19, 2012, Brown and another sergeant
interviewed appellant, once before showing him the video and once while
watching it.[6] Appellant provided the following narration of events: He said he
tased Dennis twice to get her into the patrol car. He was told she kicked him in the
chest during that process, but he did not notice it at the time. After being placed in
the back seat, she kicked at the window. He went around to the other side of the
vehicle to get her seated upright so her seatbelt could be fastened. He conducted a
spark check or display of the Taser while in the back seat with Dennis to induce
her to sit up.[7] He denied tasing her in the back seat, and acknowledged it would
not have been within Department policy to have tased her at that point. Appellant

---

[6]     Appellant was represented by counsel when interviewed.

[7]     A "spark check" is a check on the operational condition of the Taser in which an
officer flips off the safety, presses the trigger, listens for a pulse, and looks for a spark. A
similar action is called a "'display'" when used to warn or intimidate a suspect.

4

admitted that he did not give Dennis a warning prior to tasing her. He acknowledged that no exigent circumstances justified not giving a warning.

Appellant said it was "possible" Officer Bauman indicated he was videotaping or that Officer Buruiana told him someone was videotaping, but he could not recall. He stated he "did not recall" seeing the video later at the station. He acknowledged that the existence of a video is something that should be included in an arrest report. He acknowledged that he was asked by a sergeant at the scene whether a video of the incident existed and responded that there was none. Asked if he would have informed the sergeant at the scene of the existence of Bauman's video had he been aware of it, he responded: "No. That would have been the other officer videotaping, that would have been his job to tell . . . the sergeant about it." Appellant also told Sergeant Brown that Bauman had a reputation for shooting videos in the field, and that although he was aware of Bauman's reputation prior to the incident, he did not provide that information to the sergeant at the scene. Appellant stated during the interview that he learned about Bauman's video the next day, December 5, when he received a phone call at home, but that he did not recall who called him.

C. *Board of Rights Hearing*

    1. *Counts One and Two: Appellant "used unauthorized force" when he tased Dennis while she stood in the doorway of the patrol car and when she was seated in the back of the police vehicle*

        a. *Evidence*

There was no dispute at the Board of Rights hearing that appellant tased Dennis while she stood in the doorway of the patrol car. All the witnesses, including appellant, testified he had done so, and the video clearly showed it. The sole issue as to count one was whether appellant was justified in using that type of

force under the circumstances. With respect to count two -- tasing Dennis in the back seat of the patrol car -- the witnesses, including appellant, agreed that such use of force would not have been appropriate at that time. The sole issue was whether a tasing occurred.

The video showed that Dennis, who was handcuffed, passively resisted appellant's and other officers' efforts to place her into one of the patrol cars. Appellant managed to push her part way into the back seat of his patrol car. Dennis tried to stand up and get back out, but appellant blocked her with his restraining arm. As he stood next to her, appellant tased Dennis and she fell into the back seat, allowing the officers to close the door. At that point she was lying on her stomach across the rear seat.

After tasing Dennis the first time, appellant called for a supervisor to come to the location. Still holding the Taser, he then got into the back seat to get Dennis upright so her seatbelt could be fastened. In the video recording, multiple activations of the Taser can be heard, and the video shows, through the back window, one activation while Dennis is sitting upright and Buruiana is reaching inside for her seatbelt. In the video, Officer Lepe is heard saying immediately prior to the Taser activation shown on camera: "Why would he have to tase her?" As Officer Buruiana is reaching into the car to fasten Dennis's seatbelt, immediately after that activation, she is heard to say: "As long as you don't -- don't tase her; okay? Thank you."

The Board reviewed the video recording revealing appellant's actions with the Taser in the back seat of the patrol car multiple times.[8] Sergeant Michael Hall, the Department's expert witness on Tasers and Department policy concerning their use, and Sergeant Brown testified that in viewing the video, they observed

_____

[8]  The Board consisted of two Department captains and a civilian.

appellant contact Dennis with the activated Taser at least once in the back seat.[9] Sergeant Hall explained that what he saw on the video -- a spark stretching between the Taser and Dennis's arm as appellant pulled the weapon away -- would not have occurred had appellant simply displayed the spark. Hall opined that Dennis would have been able to feel the effects of the Taser up to two inches away from her body.

Appellant testified that while he was helping put Dennis in the back of his patrol car, she was "aggressive and combative." After he got her part way into the patrol car, she "launched" herself up and pushed forward, and that he had to block her from getting back out. Bauman handed appellant his Taser and appellant tased Dennis. It seemed to have no effect, so he did it a second time.[10] Although appellant claimed to have been justified in using the Taser when Dennis refused to get into the patrol car, in his testimony, he acknowledged that "[l]ooking back," he had other options: "I should have just had the other officer maybe get in the other side of the police car and maybe pull her in from her shoulders or something to that effect." After Dennis fell into the vehicle, as appellant was closing the door, she unintentionally kicked him in the stomach while flailing her feet.[11] Asked what significance the contact of her foot with his stomach had on the original use of

---

[9] An electronic log inside the Taser keeps a record of its activations. The log for the Taser used by appellant showed four activations on December 4, 2010, during the encounter with Dennis. The first occurred at 09:59:37 Greenwich Mean Time. The second occurred just over a minute later, at 10:00:44. The third and fourth occurred within 30 seconds of the second activation, at 10:00:57 and 10:01:12. The Department's representative argued that appellant tased Dennis three times in the back seat based on the log and the sounds of the Taser being activated, heard on the video recording.

[10] Later in his testimony, appellant acknowledged that from the timing of the Taser activity recorded on the log, he must have tased her only once while at the car door.

[11] Appellant did not observe Dennis kick the patrol car's window.

force, the following use of force, "or any force that [he] used on her," appellant said: "None" and that he "actually tased [her] before that kick."

Appellant got into the back seat to buckle Dennis in, telling her to sit up or he would tase her again and displaying a spark to induce her to sit up. He did not believe he made contact with Dennis with the Taser at that time. Although the Taser's log showed additional activations, appellant did not recall activating the Taser again. At the time of the incident, appellant had been employed as a police officer for approximately four years, and was aware of the Department's policy limiting the use of force.

Officer Buruiana testified that she asked for a Taser and for appellant's assistance after Dennis positioned herself against the patrol car in a way that prevented the officers from pushing her inside. When Dennis was first tased by appellant, she fell onto the back seat and her feet knocked against the window when the door was closed. After appellant went around the vehicle to the other door to sit Dennis up, Buruiana opened the door on her side to assist, and heard the Taser being activated. She did not see the Taser make contact with Dennis, and observed no reaction from Dennis indicating she had been tased.[12] Buriana

---

[12]     On December 7, Officer Buruiana prepared a statement providing the following description of events: Dennis started kicking the window after being placed in the back of the patrol car; Buruiana requested a Taser; appellant took the Taser, opened the door and displayed a spark, telling Dennis to stop or she would be tased; Dennis kicked appellant in the chest; appellant tased Dennis twice in fairly quick succession. Buruiana testified that appellant asked her to prepare the statement and she sent it to him when she completed it. Although she did not see Dennis kick appellant, she put it in her statement because appellant told her he had been kicked. Appellant denied asking Buruiana to prepare the statement.

claimed that she said "'don't tase her'" because she was concerned that if Dennis were tased while Buriana was touching her, she would feel the shock.[13]

Officer Bauman testified that he saw appellant tase Dennis just once, prior to getting her into the back seat of the patrol car. Although he did not see Dennis kick or attempt to kick any officer, he believed tasing her was in accordance with Department policy because she was "grappling" with appellant at the door of the patrol car and because, according to appellant, she had kicked him. He heard the Taser being activated while appellant was in the back seat and saw a spark, but believed he was witnessing a spark check or display.[14]

### b. *Board's Finding*

With respect to count one, the Board found that although Dennis was failing to cooperate with the officers' efforts to place her in the patrol car and passively resisting, she was "non-aggressive" and "posed no imminent threat to [appellant] or the other officers" or "danger to the community." Nonetheless, appellant "administer[ed] a contact tase on Dennis'[s] left side, causing her to fall inside of the rear seat area of the [patrol] vehicle."

With respect to count two, the Board found that "[a]t the time of this contact tase, Dennis appeared to be seated and in compliance," "did not appear to pose an imminent threat to [appellant] or the other officers," and "did not display a potential for injury to anyone" or show "signs of attempting to escape." Accordingly, appellant's actions were not "a reasonable or necessary response to

---

[13]     Sergeant Hall, the Department's taser expert, testified that a person holding or touching the person tased would not feel anything unless his or her hand was between or near the two electrodes. Hall testified that officers are informed of this fact in their training.

[14]     Officer Lepe did not testify.

9

Dennis'[s] actions," and were not in accordance with the standard of *Graham v. Connor* (1989) 490 U.S. 386. In rejecting appellant's contention that no contact tase occurred in the back seat of the patrol car, the Board relied on Officer Lepe's and Officer Buriana's nearly simultaneous comments, heard on the video, asking why appellant would tase her and telling appellant not to tase her. The Board also explained that having viewed the relevant portion of the video multiple times, its members agreed with Sergeants Brown and Hall that the video clearly showed at least one instance of appellant contacting Dennis with the activated Taser in the back seat of the patrol car.

 2. *Count Four: Appellant "failed to accurately document the Use of Force in the arrest report"*

 a. *Evidence*

Under the heading "Use of Force," the arrest report stated: "Approx 5 seconds after we closed the back door, the suspect began kicking the back window of the p[]atrol vehicle. I opened the car door and after several unsuccessful attempts to verbalize with the suspect, I gave the suspect the use of a TASER warning. I stated 'Stop what you are doing or we may use the TASER, which may cause you serious injury.' The suspect replied 'I don't care do what you want[.]' I instructed [O]fficer Lepe to open the rear driver side door of the vehicle and help me get the suspect in the upright position with her seatbelt fastened. [Officer] Lepe went to the driver side of the vehicle and opened the back to seatbelt the suspect in. I attempted to calm the suspect through verbalization, but the more I talked to the suspect, the more violent she became. The suspect became more enraged and kicked me . . . in the chest making me lose my balance. Suspect then began trying to kick the windows out of the police vehicle. [Officer] Lepe took (2) steps back and I pressed the trigger and delivered a 5 second burst of electrical

10

energy to the suspect's right shoulder. I assessed as soon as the (5) second burst was cycled. I again attempted to verbalize with the suspect. I stated 'Stop resisting or I am going to use the TASER again.' Suspect replied 'I don't care.' I pressed the trigger for second time and delivered a (5) second burst of electrical energy to the suspect's upper chest. Suspect then became compliant and we were able to seatbelt her in the vehicle."[15] Appellant's name appears on the front page of the arrest report as the "reporting officer."

On December 7, appellant prepared a follow-up report to "correct . . . errors" in the original report. The follow-up report stated that Officer Bauman gave a warning to Dennis, telling her "if she failed to comply with [the officer's] directions, a second taser shock would be applied." The report also stated: "After the second taser was applied, the suspect fell over in the rear seat. [I] . . . walked around to the driver[']s side of the car and informed the suspect that if she did not comply with officers['] commands, a third shock would be delivered. [I] . . . conducted a show of force and activated the taser without applying the taser to the suspect (Spark Check) to gain compliance. [T]he suspect immediately sat up and allowed officers to apply her seatbelt. [T]he suspect was compliant from that point on."[16]

In his testimony before the Board, appellant claimed he did not write the portions of the original arrest report stating that he had been kicked and that he had

---

[15]     As a result of the report, Dennis was booked for battery on a peace officer (Pen. Code, § 243, subd. (b).) Appellant contacted the booking officer to ensure the battery was charged as a misdemeanor.

[16]     On January 18, 2011, Officer Bauman prepared a report stating that he had not given Dennis a warning. Appellant testified Buruiana told him Bauman issued a warning. Buruiana testified that she could not recall telling appellant that Bauman had issued a warning; in her statement (see fn. 13, above), she wrote that a warning had come from appellant.

given warnings to Dennis.[17] He acknowledged that neither the arrest report nor the amended report accurately reflected what happened at the scene. Among other things, he admitted he did not give a warning, as the original report indicated, and that he did not hear Bauman give a warning, as his amended report indicated.

Sergeant Brown testified that Lepe told him he began preparing the arrest report and then turned it over to appellant to write the use of force section. The Department introduced an email Lepe sent to appellant at 4:21 a.m. on December 4 containing a partial draft of the arrest report. Lepe's draft included the same language as the first page of the final arrest report -- the portion of the report detailing the "Investigation" and the initial contact with Dennis. Lepe's draft did

---

[17] Appellant testified that he had drafted a paragraph in the "Investigation" portion of the arrest report, describing Dennis's behavior prior to his use of force. Specifically, appellant attested to writing the following language found in the arrest report: "As I, [appellant's name], was trying to walk the suspect to the back seat of our patrol vehicle with the assistance of [Officer Lepe,] [s]uspect became belligerent and started screaming. . . . I [appellant's name,] maintained a firm grip on the suspect['s] right forearm as [Officer Lepe] maintained a hold of [her] left forearm we attempted to get [her] in the back seat of the patrol vehicle. Both [O]fficer Lepe and I released the firm grip we had on the suspect as we sat her in the back seat of the police vehicle. Suspect seemed to calm down long enough to get the back door of the p[]atrol vehicle closed. [¶]. . . Approx 5 seconds after we closed the back door, the suspect began kicking the back window of the p[]atrol vehicle. . . . I instructed [O]fficer Lepe to open the rear driver side door of the vehicle and help me get the suspect in the upright position with her seatbelt fastened. [Officer] Lepe went to the driver side of the vehicle and opened the back to seatbelt the suspect in. . . . Suspect then began trying to kick the windows out of the police vehicle. [Officer] Lepe took [two] steps back and I pressed the trigger and delivered a five-second burst of electrical energy to the suspect's right shoulder. . . . I pressed the trigger for a second time and delivered a (5) second burst of electrical energy to the suspect's upper chest. Suspect then became compliant and we were able to seatbelt her in the vehicle."

12

not include a "Use of Force" section describing Dennis's behavior at the time of the tasing.[18]

Sergeant Fournier testified that appellant told him at the scene that Dennis had tried to kick out the windows of the patrol car and had kicked him in the torso. Appellant also said he tased Dennis twice to render her compliant. Appellant did not mention conducting a spark check. After the sergeant directed Officer Lepe to write the "Investigation" portion of the report and appellant to write the "Use of Force" section, appellant brought drafts of the report to Fournier for his review. The drafts contained essentially the same narrative as appeared in the final report.

Officer Jeff Smith, who partnered with appellant the day after the incident, testified that appellant asked his advice concerning how to prepare a Use of Force report. Smith reviewed the arrest report with appellant, concluded it was poorly written, and advised him to prepare an amended report. Smith specifically advised appellant to include an accounting of his alleged activation of the Taser to conduct a spark check or display.

### b. *Board's Finding*

The Board found appellant guilty of preparing a false report, stating that "the actions observed in the video were significantly different than what is asserted in the use of force section of the arrest report." In reaching its conclusion on count four, the Board referenced its findings on counts one and three -- that appellant

---

[18] Appellant testified he did not recall getting the email. He claimed he delivered his portion of the report to Lepe on a USB drive, and that Lepe finished the report. Appellant also testified that he did not review the final report before accompanying Lepe to hand it in. Asked to explain how he knew Dennis had been charged with a felony prior to interceding with the booking officer to ensure the charge was reduced to a misdemeanor, he stated that he must have "glanced" at the front page of the arrest report, where the booking charge was reflected.

13

tased Dennis twice, once while outside the vehicle and a second time a minute later, when they were in the back seat of the patrol car -- observing that its findings on the circumstances surrounding the tasings were "significantly different than what [appellant] articulated in the arrest report." The Board found that there was "no evidence that Dennis behaved in a violent manner," "no evidence that Dennis kicked [appellant] in the chest, causing him to lose his balance" or that she was "trying to kick out the windows of the police vehicle," and "clearly no evidence that [appellant] delivered any of the verbalizations documented in the arrest report." The Board expressed particular concern about the claims made in the report that Dennis kicked appellant and that appellant warned her prior to deploying the Taser, as "[t]his portion of the arrest report is the most significant because it is the articulation of the suspect's actions that is used by the Department to evaluate the justification for an officer to use force and appropriateness of the force option used." The Board specifically found that the arrest report was not just inaccurate, but "false," and written by appellant "to justify his inappropriate and unjustified use of a Taser."

The Board found appellant's claim that he did not draft significant portions of the Use of Force section of the arrest report "not credible," finding persuasive Sergeant Fournier's testimony that he directed appellant to write it and the evidence that Officer Lepe emailed the "Investigation" portion of the report to appellant so appellant could add the Use of Force section to complete the report.

14

3. *Counts Six and Eight: Appellant failed to disclose evidence of a Use of Force incident to a Department supervisor and made a false statement to Sergeant Brown during an administrative investigation when he denied knowledge of the existence of a video recording of a use of force incident*

a. *Evidence*

Appellant was charged in count six with failing to inform Sergeant Fournier of the existence of the video on the day of the incident, and in count eight with being untruthful during the investigatory interview with Sergeant Brown concerning when and how he learned of the existence of the video. Appellant did not dispute that when asked at the scene, he told Sergeant Fournier he knew of no video recording of the incident and that he did not report the existence of a video to Fournier at any time on December 4. Appellant also acknowledged that he told Sergeant Brown during the January 2012 interview that he did not learn of the video's existence until December 5.

Officer Bauman testified that when he started recording the encounter with Dennis, he tapped the camera to let Officer Lepe know. He made the same gesture to Officer Buruiana when she arrived at the scene, and also said: "I'm recording."[19] Bauman testified that after tasing Dennis to get her into the patrol car, appellant asked him whether he was recording, and he replied in the affirmative.[20] Bauman further testified that he showed the video to appellant, Lepe and Buruiana after they returned to the station. When the playback started to display the first tasing, appellant told Bauman to turn it off because he did not

---

[19]　On the video, Bauman can be heard calling Buruiana's name when she arrives and saying "I just wanted you to know."

[20]　In the video, a male voice is heard saying "You're recording it[,] right?" Appellant and Buruiana testified the speaker was Lepe.

15

"want that shit." At the holiday party that evening, Sergeant Fournier asked Bauman for the video, which he supplied a few days later. In the meantime, appellant called Bauman and told him to get rid of the video or to tell Fournier he lost it. After Bauman gave the video to Fournier, appellant called and asked "why the fuck" he had done so.[21]

Officer Ignacio testified that after he and his partner, Officer Jones, arrived at the scene, he spoke to Bauman about his camera and the video recording while appellant and Jones stood within earshot.[22] Jones recalled conversing with appellant about what happened while a second conversation about the video and the equipment was occurring nearby between Ignacio and Bauman. Jones initially testified he did not understand from the conversation he overheard that Bauman had recorded a video of the incident. After being shown the video, however, Jones acknowledged he took part in a conversation in which someone said "'we got it all on video.'"

Officer Scott Danielson, who worked at the same station as appellant and the other officers, testified that appellant approached him on December 4, sometime between 3:20 and 4:10 a.m., to ask whether he was familiar with a video Bauman

---

[21] Appellant's telephone bill showed multiple calls and texts to Bauman on December 5 and 6.

[22] In the video, after Officers Ignacio and Jones arrive, an unidentified speaker says "She kicked him in the stomach when we were putting her in the car." Another responds: "She kicked Superman in the stomach, dude. Something's wrong with her." Another speaker says: "We got it all on video." A few moments later, Ignacio asks Bauman: "Do we need to download like something from your computer to watch the video?" and a discussion ensues concerning how the video can be re-played, how much the camera cost, who manufactured it, and where to purchase one. Appellant is seen in the video standing near the conversing officers, periodically looking at and/or manipulating his cell phone.

16

was "showing everybody."[23] Appellant said the video depicted him using force and wearing a Superman logo. At the Christmas party that evening, Danielson spoke to Sergeant Fournier, asking how he liked the "Superman video." Fournier appeared surprised to hear about it. Danielson also testified that earlier in the day, before being approached by appellant, he had seen officers surrounding Bauman's desk. During an investigatory interview, he said this occurred a few hours before his conversation with appellant; he testified at the hearing that his previous statement had been an estimate.

Sergeant Fournier confirmed that at the holiday party, Danielson informed him of the existence of a video recording in which appellant displayed a Superman logo, and that this was the first he had heard of it. Fournier immediately located Bauman, ordered him to produce the video, and asked why he had said nothing about it before. Bauman told Fournier appellant wanted him to get rid of it. When Bauman gave Fournier the recording a few days later, he said appellant had wanted him to claim it was lost or destroyed. After viewing the video, Fournier concluded that what he saw did not match the description of events in the report prepared by appellant and Lepe.

Appellant testified that when he first approached the others, Bauman did nothing to indicate he was recording. Appellant denied saying or hearing anyone say "'[y]ou're recording this, right?'" Appellant also testified that although he was standing nearby, he did not hear the conversation between Bauman and Ignacio about the video and the camera. He denied watching the video at Bauman's desk, and denied having a conversation with Danielson about the video later that

---

[23]     Danielson based his estimate of the timing on his log, which showed that to be the only period he was at the station. He testified that the log was generally accurate, but that if he had returned to the station for a few minutes during his shift, he probably would not have documented it.

morning. He testified that he first learned of the video late the following day, during a conversation with Sergeant Dax Martin, whom he and Officer Smith met at a coffee shop. Appellant said that after the meeting, he contacted or attempted to contact Bauman to confirm the existence of the video and to ask for a copy.[24] He denied telling Bauman to get rid of the video. He claimed that Bauman told him his personal copy of the video was lost. Appellant told Bauman to make sure it "stay[ed] lost" because he feared that a copy would end up on social media.

Officer Buruiana also denied knowing Bauman was recording the incident. She stated she was not aware of the existence of the video for two weeks. She denied watching the video with Bauman and the others at the station after their return.

Officer Smith testified he first heard about the video recording when he and appellant met Sergeant Martin at a coffee shop. Smith said appellant seemed surprised to hear about it.

b. *Board's Finding*

The Board found that appellant knew of the existence of Officer Bauman's video on December 4, 2010 and failed to report it to Sergeant Fournier. It based this finding on (1) the evidence that appellant was in the immediate vicinity of the officers who were discussing the recording at the scene; (2) Bauman's testimony that appellant was the speaker heard on the video recording confirming that Bauman was videotaping; (3) Bauman's testimony that he showed appellant and the other officers the video recording at the station immediately after the incident;

---

[24] Appellant testified that Sergeant Martin did not know much about the video, only that there was a video circulating involving a use of force in Hollywood. Asked why he knew to call Bauman, rather than one of the other officers at the scene, appellant had no explanation.

(4) Officer Danielson's testimony that on December 4, appellant asked if he had heard about a video of the incident and described the contents; (5) appellant's knowledge that Bauman had a reputation for video recording in the field; and (6) the uncontradicted evidence that appellant denied knowing about any video recording when questioned by Sergeant Fournier. The Board acknowledged that Bauman had "some credibility issues," but observed that his testimony was in part corroborated by Danielson who "[was] found by the Board to be completely credible . . . with no obvious reason to testify falsely."

With respect to count eight, the Board found, based on essentially the same evidence, that appellant made false statements during the January 2012 interview when he repeatedly denied having knowledge of the video recording until being informed of its existence on December 5.


### 4. *Penalty*

The Board reviewed appellant's personnel files and found appellant's work history to be devoid of any prior sustained complaints. His files included appreciative letters from private citizens. In addition, two former supervisors testified to his good character and work ethic. Nonetheless, the Board concluded that termination was the appropriate penalty. It found that appellant "seriously violate[d] the core values and many parts of the code of ethics," and that the counts of which he was found guilty "were committed purposefully and done in a self-serving manner," thus "violat[ing] the profound trust that the Department . . . empowered [appellant] with, and the trust of the public to ensure the safety of all people." The Board observed that Dennis was in a "position of vulnerability that displayed a lack of judgment, and behavior that likely was not the norm for her," and that it was the responsibility of the Department and its officers to protect her. Instead, appellant used force on her, "violat[ing] the Department's core value of

19

respect for people." The Board stressed that appellant's action in preparing an inaccurate arrest report and providing false statements to a Department supervisor during an investigation "in and of themselves render[ed] [him] unable and unqualified to perform the basic duties of a police officer."

### D. *Hearing in the Trial Court*

Appellant filed a petition for writ of mandate, contending the Board abused its discretion by terminating him from his position as a police officer, and that its decision was not supported by the findings and/or the evidence. In his supporting memorandum, he contended that the Board ignored the evidence indicating his actions in tasing Dennis were reasonable under the circumstances, including the evidence that Dennis kicked him and the window of the patrol car, and the testimony of officers present that they believed the use of force was appropriate. He also contended the Board ignored the denials of the officers on the scene that appellant tased Dennis when they were in the back seat.

With respect to the finding that he failed to accurately document the use of force in the arrest report, appellant contended that the evidence did not show the report was significantly inaccurate. Alternatively, he contended the evidence did not show that he wrote the inaccurate portions. He claimed to have written his portion of the arrest report "truthfully based on his recollection of the incident," and asserted that "being wrong . . . is not dishonesty . . . ." With respect to the finding that appellant failed to disclose the existence of the video and was dishonest when questioned about it during the investigation, appellant contended the Board failed to address the "plethora of corroborating evidence" that appellant did not know about the video on December 4, 2010 -- such as the testimony of the other officers present that they were unaware of it -- and that the Board relied too heavily on Bauman, who had "credibility issues," and Danielson who, according to

20

his own records, was only briefly at the station on December 4. Finally, appellant contended the discipline imposed was "excessive and constituted an abuse of discretion."

After conducting an independent review of the evidence, the court affirmed the Board's findings and denied the writ. Concerning count one, the court found that appellant's use of force was not reasonable under the Department's Use of Force Policy and *Graham v. Connor*, *supra*, 490 U.S. 386: "Although the video shows that Dennis resisted the officers' orders, repeatedly refused to enter the patrol vehicle, and was 'belligerent, intoxicated, and . . . uncooperative' [citation], it also shows that Dennis displayed no violent tendencies at the time of the incident" and "posed no imminent threat to the four officers at the scene" or "potential for injury to citizens, officers or subjects." "Nor was this a situation where [appellant] was under any kind of time pressure such that he could reasonably claim to have acted in the moment. As depicted in the video, [appellant] used only one arm to pin Dennis against the door frame of the vehicle for a few seconds before he used a taser on her [citation]. There was no indication that he needed a taser to control her. In addition, as [appellant] admits [citation], there were other resources available to [him]. Three other officers were present who could have assisted in placing Dennis in the vehicle without the use of a taser."

With respect to appellant's contention that the use of force was reasonable because the other officers present believed appellant's action in tasing Dennis to get her into the patrol car was appropriate, the court stated: "The appropriateness of use of force is determined by the factors listed in the Use of Force Policy, not the opinions, stated or inferred, of individual officers." The court pointed out that Bauman "gave no indication that his opinions concerning [appellant's] use of force were based on [the Department's Use of Force] policy."

21

With respect to count two, the court observed that Dennis "was even less of a threat because, as the video shows, she was sitting upright in the back of the police vehicle, handcuffed, when [appellant] tased her." Appellant's denial that he tased Dennis in the back seat of the patrol vehicle was "belied by the video, which shows [appellant] using the taser on Dennis while she was sitting upright in the back seat." The court also was persuaded by the testimony of Sergeant Hall, who was certain that "'the energy made contact with [Dennis].'" The court found irrelevant the fact that none of the other officers testified to observing the back seat tasing because none were in a position to observe it -- even Buruiana's view was obscured by Dennis being between her and appellant. Moreover, Buruiana's belief that she would have felt the energy if appellant had tased Dennis while Buruiana was touching her was refuted by Sergeant Hall's testimony.

With respect to count four, the court addressed appellant's contentions that the report was not significantly inaccurate and that any inaccuracies were innocent mistakes, stating: "The arrest report is very clearly an inaccurate account of what led to and attempted to justify the use of a taser," particularly the language in the Use of Force section. "The supplemental report prepared by [appellant] made minor corrections to the use of force narrative [citation], but those corrections [did] not address all of the discrepancies . . . , especially when compared to the video evidence of the incident [citation]. . . . [T]he video does not depict Dennis kicking the window of the patrol vehicle, [appellant] is not seen giving Dennis verbalized commands, and Dennis is not seen kicking [appellant] [citation]. [Appellant] himself admitted in his testimony that, after watching the video, neither the Arrest Report [citation] nor his supplemental report [citation] accurately reflects what happened in the use of force incident. [Citation.]"

The court found appellant's claim that he did not write the entire Use of Force section in the arrest report refuted by the evidence that he was told to write

22

that section by Sergeant Fournier, Fournier's testimony that the drafts appellant gave him for review were essentially the same as the final report, and the email from Lepe to appellant, which included only language for the investigation section of the arrest report. Moreover, appellant "fail[ed] to explain why, if he believed the use of force portion of the Arrest Report was inaccurate, he did not make further changes when he wrote the supplemental report."

With respect to counts six and eight, the court found the preponderance of the evidence showed that appellant knew the incident was being videotaped at the scene: "Immediately after the first tasing incident, a voice is heard on the video sa[y]ing 'You're recording, right?' Another voice, (apparently Bauman's) responds 'Hm-hmm.' [Citation.] The witnesses dispute whether Lepe or [appellant] asked the question and the Court cannot make that distinction either. However, even if Lepe was the speaker, [appellant] was immediately present when the question was asked. The video does not depict any distracting sounds or visuals. In light of the video, [appellant's] denial that he knew Bauman was videotaping the incident is not credible." The court found further support for counts six and eight in the video's depiction of the conversations between appellant and Officers Ignacio, Jones and Bauman: "The officers are heard discussing the video camera [citation]. Although appellant is looking at a cell phone, he is clearly present during the conversation." Additional support for its findings on counts six and eight came from Bauman's testimony -- corroborated by Danielson -- that he showed the video to appellant, Lepe and Buruiana at the station, and Danielson's testimony that appellant told him about the video on December 4, prior to the holiday party. With respect to appellant's contention that his asserted ignorance of the existence of the video was supported by Buruiana's testimony that she was unaware of it, the court found the bulk of her testimony "not credible" and geared toward "sav[ing] [appellant] from discipline."

23

Turning to the discipline imposed, the court found that in light of the Board's conclusion that appellant was found guilty of charges that "'seriously violate the core values and many parts of the code of ethics,'" that the actions taken "'were committed purposefully and done in a self-serving manner,'" and that his conduct "'violated the profound trust that the Department . . . empowered [him] with,'" as well as, "'the trust of the public to ensure the safety of all people,'" the Board's decision to terminate appellant's employment "was not a 'manifest' abuse of discretion or arbitrary or capricious such that the Court should disturb the penalty imposed . . . ." Appellant appealed the court's determination.

## DISCUSSION

### A. *Standard of Review*

A trial court reviews the validity of a public agency's quasi-judicial decision by way of writ of administrative mandate under section 1094.5 of the Code of Civil Procedure. (*Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1196; *Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313.) If the administrative decision substantially affects a "fundamental vested right," the trial court must exercise its independent judgment on the evidence, "conduct[ing] an independent review of the entire record to determine whether the weight of the evidence supports the administrative findings." (*Wences v. City of Los Angeles, supra,* 177 Cal.App.4th at p. 313, citing *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143.) The parties do not dispute that the Board of Rights hearing was quasi-judicial or that appellant's termination from the Department affected his fundamental vested right in his employment as a police officer. (See *Wences v. City of Los Angeles*, *supra*, at p. 314, and cases cited therein ["It repeatedly has been held that '[d]iscipline imposed on public employees affects their fundamental vested right in employment,'[] and therefore, when a public

24

employee challenges an employer's disciplinary action in a mandamus proceeding, the trial court is required to exercise its independent judgment on the evidence."].)

In exercising independent judgment, the trial court makes its own credibility determinations and draws its own inferences, but at the same time affords a "strong presumption of correctness" to the administrative decision. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 811-812, 817; *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077.) The burden of proof rests on the complaining party to convince the court that the agency's decision is contrary to the weight of the evidence. (*Fukuda v. City of Angels*, *supra*, 40 Cal.4th at pp. 817, 820; *Breslin v. City and County of San Francisco*, at p. 1077.)

In our review of the trial court's exercise of independent judgment under Code of Civil Procedure section 1094.5, we determine whether the record provides substantial evidence supporting the court's factual findings. (*Breslin v. City and County of San Francisco*, *supra*, 146 Cal.App.4th at pp. 1077-1078.) "[W]e may not reweigh the evidence, but consider that evidence in the light most favorable to the trial court, indulging in every reasonable inference in favor of the trial court's findings and resolving all conflicts in its favor." (*Id*. at p. 1078.) We may not uphold a finding based on ""inherently improbable"" evidence, but ""[t]o warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]""" (*People v. Barnes* (1986) 42 Cal.3d 284, 306.)

25

B. *Counts One and Two: Use of Excessive Force*

The trial court reviewed the evidence in the administrative record and, applying the independent judgment standard, found that appellant tased Dennis twice -- once outside the patrol car and once in the back seat of the vehicle -- and that on both occasions the use of force was not reasonable. We find the trial court's determinations supported by substantial evidence.

The Department's policy and procedure manual, section 240.10, provides that officers are permitted to use whatever is reasonable and necessary to protect others or themselves from bodily harm. The Department's Use of Force Directive list the factors used to determine reasonableness: "[1] The seriousness of the crime or suspected offense; [2] The level of threat or resistance presented by the subject; [3] Whether the subject was posing an immediate threat to officers or a danger to the community; [4] The potential for injury to citizens, officers or subjects; [5] The risk or apparent attempt by the subject to escape; [6] The conduct of the subject being confronted (as reasonably perceived by the officer at the time); [7] The time available to an officer to make a decision; [8] The availability of other resources; [9] The training and experience of the officer; [10] The proximity or access of weapons to the subject; [11] Officer versus subject factors such as age, size, relative strength, skill level, injury/exhaustion and number officers versus subjects; and [12] The environmental factors and/or other exigent circumstances." The manual and Use of Force Directive recognize that the applicable legal standard is that set forth in *Graham v. Connor*: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. [Citation.] . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular

26

situation." (490 U.S. at pp. 396-397.) The test of reasonableness is "'not capable of precise definition or mechanical application,'" but requires a fact-specific inquiry into the officer's actions and the circumstances surrounding them. (*Graham v. Connor*, at p. 396; see *People v. Brown* (2016) 245 Cal.App.4th 140, 166, 167, 169 [In its application to an officer's use of force, "'"'the test of reasonableness'" . . . is highly situational and fact specific, and in applying the test, the [trier of fact's] task not only permitted but required it to apply its own independent sense of reasonableness, using whatever community norms [it] might bring to the issue."].)

Here, the trial court reviewed the evidence and the applicable standards and reached the same conclusion as the Board, viz., that appellant's use of force in tasing Dennis was unreasonable. With respect to count one, the court recognized that the video showed Dennis to be uncooperative and passively resistant, but also showed that she was not violent and posed no imminent threat to appellant, the other officers at the scene or any civilian in the vicinity. The court noted that as depicted in the video, appellant had Dennis pinned against the door frame when he tased her, despite the absence of any evidence that use of the taser was necessary to control her. With respect to count two, the court noted that Dennis posed "even less of a threat" once in the back seat of the car, and that Hall's testimony and the video established that appellant's use of the Taser was not a mere "'spark check.'"

These findings were supported by substantial evidence. With respect to count one, our review of the video confirms that Dennis was acting obnoxiously, but not aggressively. There were no exigent circumstances demanding quick action. She had allowed the officers to handcuff her, and her resistance to being placed in the patrol car could have been overcome without the use of a Taser.

Appellant contends the testimony of Officers Buruiana and Bauman establish that his use of force was reasonable with respect to the first tasing

incident, citing Buruiana's testimony that she requested the Taser and Bauman's testimony that he had no concerns about appellant's use of force at the time. That Buruiana asked for a Taser to be made available does not demonstrate that the immediate use of force was appropriate. As the trial court observed, the propriety of the use of force is determined by the factors listed in the Use of Force policy, not an individual officer's stated or inferred opinions. Similarly, Bauman was not a use of force expert and nothing suggests his opinion was based on the Department's policy. Moreover, appellant's contentions on appeal with respect to count one ignore his own testimony that he had the option of getting help from the other officers, and that there were no exigent circumstances requiring immediate action. In short, the finding that the first tasing involved the use of inappropriate force is well supported by the evidence.[25]

---

[25]    In his reply brief, appellant cites *Lewis v. City of Fresno* (E.D. Cal. Dec. 16, 2013) Case No. 1:11-CV-01415-LJO-SKO [2013 U.S. Dist. LEXIS 176317]. There, the court held that use of a Taser on an arrestee who had one hand cuffed to a medical gurney was reasonable where the arrestee kicked the officer twice and bit his arm multiple times, drawing blood. (*Id*. at *4-*5.) Appellant relies on *Lewis* and the cases it cites to suggest that use of a Taser is appropriate to gain control of a handcuffed arrestee who is struggling or resisting. The cases cited, like *Lewis* itself, involved factual situations that justified the use of force. (See, e.g., *Yarnall v. Mendez* (2007) 509 F.Supp.2d 421, 432-433 [suspect running away]; *Rose v. City of Lafayette* (D.Colo. Feb. 12, 2007) Civil Action No. 05-cv-00311-WDM-MJW [2007 U.S. Dist. LEXIS 9839, *6, *9] [arrestee in detention kicked officer]; *Johnson v. City of Lincoln Park* (E.D. Mich. 2006) 434 F.Supp.2d 467, 478-479 [arrestee bit officer]; *Buckley v. Haddock* (11th Cir. 2008) 292 Fed.Appx. 791, 794-795 [arrest occurred beside busy highway at night, and arrestee's refusal to move placed both officer and arrestee in jeopardy]; *Devoe v. Rebant* (E.D. Mich. Feb. 13, 2006) Case No. 05-71863 [2006 U.S. Dist. LEXIS 5326, *21-*22] [arrestee was hostile, swearing and yelling, and situation was in danger of escalating].) Appellant ignores the multitude of cases finding use of a Taser inappropriate where other circumstances prevailed. (See, e.g., *Bryan v. MacPherson* (9th Cir. 2010) 630 F.3d 805, 826-827 [Taser inappropriately used against individual who was exhibiting "unusual behavior," "shouting gibberish, and . . . expletives," but was "unarmed, stationary, . . . [and] facing away from [the] officer at a distance of fifteen to twenty-five feet"]; *Cyrus v. Town of Mukwonago* (7th Cir. 2010) 624 F.3d 856, 863 [question of fact whether Taser

*(Fn. continued on next page.)*

28

Appellant contends the findings of the Board and the court ignored evidence that justified appellant's actions, citing his own testimony, comments overheard on the video, Buruiana's testimony, and the contents of her written statement indicating that Dennis kicked appellant in the stomach or torso during the attempts to get her into the patrol car and thereafter tried to kick out the window. Appellant himself laid to rest any possibility that kicking him or the window justified the use of the Taser. He testified that Dennis unintentionally kicked him in the stomach while flailing her feet, and that the kick neither influenced his use of force nor provided a justification for it. With respect to her allegedly kicking the window, appellant testified he did not observe it. In any event, Dennis's alleged kicking of appellant could not have supplied a basis for a reasonable officer to apply the force used by appellant. If it occurred at all, it happened *after* appellant tased her the first time and, according to the log and the video recording, approximately a minute before the second set of Taser activations. The same is true with respect to kicking the window. After the initial tasing, Dennis is seen lying on her stomach in the back seat of the patrol car. Her knees are bent and her feet touch the window once the door is closed -- possibly intentionally, but not with sufficient force to kick out the window. By the time appellant is in the back seat with Dennis, those actions have ceased.

With respect to count two, it is undisputed that by the time appellant and Dennis were both in the back seat, she was doing nothing to justify use of the Taser. Accordingly, any use of the Taser on Dennis was necessarily unreasonable.

---

inappropriately used where suspect was not violent and did not try to flee, but kept his hands in front of him to resist being handcuffed]; *Brown v. City of Golden Valley* (8th Cir. 2009) 574 F.3d 491, 499 ["unlawful" to tase "nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator"].)

Appellant contends, however that the record unequivocally shows a "spark check." The trial court, like the Board, reviewed the video and the testimony of Sergeant Hall and found otherwise. The interpretation of the evidence is for the trier of fact. (*People v. Melton* (1988) 44 Cal.3d 713, 744.) As Sergeant Hall described, the video shows the Taser in contact with Dennis's arm and a spark arching toward Dennis as it is moved. Hall was confident that the video showed a contact tase. Sergeant Brown and the members of the Board agreed. Our review of the video does not lead us to believe that their observations were inherently improbable. Accordingly, the trial court's finding that appellant tased Dennis while in the car, as charged in count two, is supported by substantial evidence.

### C. *Count Four:  Inaccurate Report*

The court found that appellant submitted an inaccurate report of the actions surrounding the use of force on Dennis. There is no question that when compared to the video and the other evidence at the hearing, the use of force portion of the arrest report was materially inaccurate. As discussed, the arrest report described Dennis as "screaming," "belligerent," and "violent," and said that she kicked appellant, "causing him to lose [his] balance," and "tr[ied] to kick out the windows" of the patrol car. It also stated that Dennis kicked appellant and the window *prior to* the first use of the Taser, implying that these were the actions that justified the use of the Taser. It further stated that Dennis was warned before each tasing. All of this was belied by the video recording and acknowledged to be untrue by appellant and other witnesses at the hearing. Moreover, it failed to clarify that the tasings took place more than a minute apart, requiring analyses of two wholly different sets of circumstances to determine whether the use of force was justified. The court, like the Board, found the arrest report to be inaccurate, and intentionally written to justify an inappropriate use of force. With respect to

30

appellant's claim that he did not finalize the arrest report, and that his contributions were re-written or re-shuffled by Officer Lepe, the court relied on Sergeant Fournier's testimony that on the day of the incident, appellant showed him drafts of the report substantially similar to the final version, and on Lepe's email showing that he sent his partial draft to appellant to allow the latter to complete the report.

Ignoring the majority of the inaccurate statements in the report, appellant first takes issue with a minor part of the trial court's findings. The court stated: "[c]ontrary to the use of force section, . . . the video does not depict Dennis kicking the window of the patrol vehicle . . . ." Appellant contends that the video recording shows Dennis's feet coming in contact with the window, and suggests that certain sounds on the video should be interpreted as Dennis's kicking the window. We presume the court intended to convey, as did the Board, that there was no evidence that Dennis was intentionally attempting to "kick out" the window, as the report stated. The video shows her lying on her stomach with her knees bent and the toes of her boots facing the side window. Assuming that from her prone position she could have kicked at the window, nothing suggests she could possibly have kicked it out. Moreover, even had the video supported the inference argued by appellant, the fact remains that the report is littered with inaccurate statements designed to justify a use of force. Dennis was not "screaming," was not "violent," and by appellant's own account engaged in no form of physical violence that would have justified the use of force prior to the first tasing.

Appellant next contends that we should presume any discrepancies in the report were caused by innocent failure of recall, claiming "there is no evidence that [a]ppellant knew what he wrote was inaccurate at the time the report was written," or that he made the statements with "'deliberate intent to deceive . . . .'" The blatant inaccuracy of the report itself is evidence to the contrary. As the trial court stressed, the video recording does not in any way support that appellant

31

"'attempted to calm [Dennis] through verbalization,'" that "'the more [he] talked, . . . the more violent she became,'" that Dennis "'became . . . enraged and kicked [him] in the chest, making [him] lose [his] balance,'" and that she then "'began trying to kick the windows out of the police vehicle.'" Further support for appellant's intent to deceive can be found in the fact that appellant's statements to Sergeant Fournier, when the incident was fresh in his mind, were in line with the faulty arrest report. Moreover, when they returned to the station, Office Bauman offered the video to appellant which would have enabled him to prepare a more accurate report, but he stated he "d[idn't] want that shit." When he heard that Sergeant Fournier had requested the video, he called Bauman to encourage him to get rid of it and claim it was lost. Within a few days, after Sergeant Fournier obtained the video from Bauman, appellant submitted an amended report. While the amended report did not greatly improve the accuracy of the arrest report, it suggested that appellant was concerned about the discrepancies between what the video would show and the original report and was attempting to create a more plausible narrative.[26] Finally, the fact that throughout the investigation and hearing, appellant attempted to distance himself from authorship of many parts of the report support his knowledge that it deliberately falsified the incident. In view of the evidence, we reject appellant's contention that, as a matter of law, the major inaccuracies in the report were necessarily innocent mistakes.

Appellant continues to contend the evidence did not support that he, rather than Lepe, drafted the majority of the report's Use of Force section. The evidence established that appellant was told by his supervisor to draft that portion of the

---

[26] The fact that appellant went out of his way to ensure Dennis was booked for a misdemeanor battery rather than a felony suggests he was aware that the report misrepresented her actions.

report, that he showed drafts of it to the supervisor, that the drafts and the final version were in accord with the officers' reports in the field, and that the report was turned in by him, under his name. The Department's position that Lepe wrote the "Investigation" portion of the report and transmitted it to appellant for him to add the Use of Force section is supported by Lepe's email.[27] The court, like the Board, made credibility findings, concluding that appellant was not telling the truth about his part in preparing and filing a false report. We have no basis to overturn the findings.

D. *Counts Six and Eight: Failure to Disclose Existence of Video*

The Board concluded that appellant was aware that Officer Bauman was videotaping the encounter with Dennis at the scene, and that he deliberately failed to inform Sergeant Fournier of the existence of the video (count six), and lied to Sergeant Brown during the investigation when asked when and how he learned of the video (count eight). The court agreed, independently finding that the preponderance of the evidence established that appellant knew the incident was being videotaped at the scene.

On the video, immediately after the first tasing, a male voice can be heard saying, "You're recording this, right?" Bauman responds affirmatively. Appellant contends there is nothing to support the inference that he made or overheard the

---

[27] Appellant contends we should disregard the email because it was sent at 4:21 a.m. and Lepe signed a probable cause declaration at 5:00 a.m. indicating he "must have continued to work on the [arrest] report after [4:21 a.m.]." The probable cause declaration was a separate document attached to the arrest report and provided the basis for the booking charges. It stated: "[Officers] responded to a drunk female inside someone else's veh[icle] . . . . [Officers] placed susp[ect] under arrest . . . . While attempting to place susp[ect] into veh[icle] susp[ect] kicked the [officer] in the chest." The fact that Lepe was working on a separate document at 5:00 a.m. has no bearing on whether he or appellant completed the arrest report.

first comment or heard the second. We disagree. As noted, the interpretation of the video was for the trier of fact. What is clear, however, is that appellant is in the vicinity of the video camera during the recording; as he points out, he is seen calling for a supervisor immediately after the statements were made. Regardless of whether appellant or another officer asked whether the incident was recorded, the trier of fact could fairly infer that appellant was present and sufficiently close to the conversation to have heard both the question and answer.

Moreover, as appellant acknowledges, this was not the only discussion of the videotaping heard on the recording on which the court relied. A lengthy conversation took place between Officers Bauman, Ignacio and Jones about the video and Bauman's camera while appellant stood nearby. Appellant claims that Jones's testimony supports his claim that he heard none of this conversation. In fact, Jones testified that despite the fact that he was somewhat distracted by a separate back and forth with appellant, he heard the conversation about the video and the equipment. During the hearing, he acknowledged being part of a conversation in which someone said "'we got it all on video.'"

Even were we to discount the statements heard on the video, the other evidence supporting appellant's knowledge of the video was overwhelming. Bauman testified that he played it for appellant and the other officers back at the station. Officer Danielson testified that on the same day, appellant asked him whether he had heard about a video depicting appellant wearing a Superman logo that Bauman was "showing everybody." Danielson's version of events was confirmed by Sergeant Fournier, who testified he first heard about the video from Danielson at the holiday party and immediately tracked down Bauman.[28] Bauman

---

[28] Appellant contends Danielson cannot be believed because he also testified that he saw appellant and the other officers watching something on Bauman's computer earlier, *(Fn. continued on next page.)*

34

testified that after word of the video got out, appellant called him, not to express surprise about its existence, but to instruct him to get rid of it.

Appellant's claim that he knew nothing about the video until he heard about it from Sergeant Martin the day after the holiday party was justifiably deemed not credible. He did not relate this version of events to Sergeant Brown during the January 2012 investigatory interview. In addition, he was evasive when asked by Sergeant Brown whether Bauman or Buruiana told him someone was videotaping, although he admitted knowing of Bauman's reputation for video recording encounters in the field. Moreover, he could not explain how he knew to immediately call Bauman after his conversation with Sergeant Martin when Martin knew little about the video or who was wearing the camera.

Appellant suggests the fact that no other officer reported the existence of the video to Sergeant Fournier is proof that no one except Bauman knew about it. There is no evidence that Officers Jones or Ignacio were asked. That the other officers kept silent is explained by their desire to protect themselves and appellant, likely aware that appellant's use of force depicted on the video was inappropriate. Moreover, it was not appellant alone who would have been subject to discipline: Bauman was violating Department policy by wearing a video camera and recording encounters in the field. Accordingly, neither the other officers'

---

and his daily log showed he was at the station for less than an hour that morning, while Bauman's log showed he was transporting Dennis to the Van Nuys jail from 3:00 a.m. through 5:45 a.m. No one testified that the officers' logs were accurate to the minute or fully accounted for all their activities during their shifts. Danielson testified that officers did not necessarily report brief returns to the station. Bauman's log bore this out: it showed him leaving the station at 8:00 p.m. on December 3 and did not mention the station again until the end of his shift, although the witnesses agreed he and the other officers were at the station after Dennis's arrest.

statements to Fournier nor their testimony at the hearing is proof that none was aware of the video at the scene.

E. *Discipline Imposed*

Appellant contends that by being discharged rather than given a lesser discipline, he has been the subject of disparate treatment when compared to the other officers at the scene. He does not dispute the general rule that "[m]ere disparity in punishment is not grounds for reinstatement" and that "'[w]hen it comes to a public agency's imposition of punishment, "there is no requirement that charges similar in nature must result in identical penalties."'" (*Pegues v. Civil Service Com.* (1998) 67 Cal.App.4th 95, 106, quoting *Talmo v. Civil Service Com.* (1991) 231 Cal.App.3d 210, 230-231.) He asserts, however, that the Department has established a higher standard of fairness, citing its penalty guide, which provides: "The Department recognizes that it is important for our employees and the communities we serve to be clear in their perception and understanding that discipline will be administered equitably and in accordance with clearly established guidelines." He also faults the trial court for failing to specifically address disparate treatment in its ruling.

Preliminarily, we find that appellant forfeited the disparate treatment argument by failing to properly raise it in the court below. It is not mentioned in the petition, and although appellant represented in his supporting memorandum that Officers Bauman and Buruiana were still employed as police officers, he did not introduce evidence establishing with any specificity the charges against them or the discipline imposed. Nor did he include any argument on disparate treatment. We note, moreover, that nothing in his allegations concerning those two officers supports his claim of disparate treatment. The officers were not involved in the preparation of a false arrest report, and there is no evidence they gave false

36

statements to Sergeant Brown during the investigation, the two charges the Board found most serious. (See *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716, 721 ["'A [peace officer's] job is a position of trust and the public has right to the highest standard of behavior from those they invest with the power and authority of a law enforcement officer. Honesty, credibility and temperament are crucial to the proper performance of an officer's duties. Dishonesty is incompatible with the public trust.'"].) Moreover, it was appellant alone who wielded the Taser, using excessive force multiple times without justification on a helpless suspect. (See *Hankla v. Long Beach Civil Service Com.* (1995) 34 Cal.App.4th 1216, 1226 [in light of officer's "conduct in escalating rather than defusing [an] argument," and "his patently reckless behavior in handling a deadly weapon," it was understandable that department "did not want an individual with so little emotional self-control or good judgment" on the force].) Accordingly, we reject appellant's claim of disparate treatment.

Appellant also suggests that the discipline imposed was excessive and constituted an abuse of discretion. As the trial court stated, "[w]hen considering the appropriateness of a penalty imposed by an administrative body," the court is "'required to uphold [the respondent's] punishment if there [is] any reasonable basis for sustaining it'" and "the underlying conduct is not in dispute." (Quoting *Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 46, 48.) It "may not substitute its judgment for the agency where the penalty is concerned." (Citing *Cummings v. Civil Service Com.* (1995) 40 Cal.App.4th 1643, 1652.) The appellate court conducts a de novo review "us[ing] the same standard as the superior court, reviewing the agency's penalty for manifest abuse of discretion." (*Deegan v. City of Mountain View*, *supra*, 72 Cal.App.4th at p. 47.)

The evidence supports the trial court's finding that appellant was guilty of multiple charges, including ones that cast serious doubt on his judgment with

37

respect to the use of force on a suspect, as well as his honesty. He not only submitted a false arrest report, but continued to fabricate throughout the investigation and hearing to cover up his original malfeasance. In imposing the ultimate sanction, the Board found this lack of honesty to be a serious impediment to the continued performance of his duties as a police officer. We find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MANELLA, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.